UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

03 DEC 22 PH 2: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

DECARLA IRENE STATEN,       )
                            )
        Plaintiff,          )
                            )
vs.                         )       Civil Action No. CV-02-S-1154-NE
                            )
HEALTHSOUTH CORPORATION,    )
*et al.,*                   )
                            )
        Defendants.         )

## MEMORANDUM OPINION

Plaintiff, DeCarla Irene Staten, an African-American female, claims that her former employer, HealthSouth Corporation,[1] subjected her to race discrimination and retaliation for engaging in protected conduct, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Plaintiff later amended her complaint to add a negligent retention claim.[2]

The action now is before the court on six motions: (1) defendant's motion for summary judgment;[3] (2) defendant's motion to strike portions of plaintiff's evidentiary

---

[1] The named defendants to this action are HealthSouth Corporation, HealthSouth Diagnostic Centers, and HealthSouth Sports Medicine Rehabilitation Center. *See* complaint (doc. no. 1). Defendants' summary judgment brief explains that "[p]laintiff's employers were HealthSouth Sports Medicine Rehabilitation Center (whose legal name is HealthSouth Holding, Inc.) and HealthSouth Diagnostic Centers (whose legal name is Diagnostic Health Corporation). HealthSouth Corporation is the parent company of these two entities." Defendants' brief opposing summary judgment, at 1 n.1. For the sake of simplicity, the court will hereinafter refer to these entities collectively as "defendant."

[2] *See* doc. no. 9 (amended complaint).

[3] Doc. no. 23.



submissions;[4] (3) defendant's motion to substitute a portion of its evidentiary submissions;[5] (4) defendant's motion for leave to file a reply brief;[6] (5) plaintiff's motion to deny defendant's motion for leave to file a reply brief and to strike the reply brief attached thereto;[7] and (6) defendants' motion to strike plaintiff's witness and exhibit list.[8]

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment should be granted, but only in part. The remaining motions before the court will be addressed in § III *infra*.

## I. SUMMARY OF FACTS

**A.    Plaintiff's Formal Education and Employment History**

Plaintiff graduated from high school in 1990, and later completed some junior college courses, but did not obtain a degree.[9] Her first job after high school was at Guntersville-Arab Medical Center, where she worked as an admissions secretary from July of 1992 until June of 1997. She next was employed by Crestwood Medical Center in Huntsville, Alabama, from August of 1997 until March of 1998 as a secretary in the "plant operations" department. Plaintiff then worked as a medical office secretary at the University of Alabama in Huntsville from August of 1998 until January of 2000. She was unemployed for approximately seven

---

[4] Doc. no. 33.

[5] Doc. no. 34.

[6] Doc. no. 37.

[7] Doc. no. 38.

[8] Doc. no. 39.

[9] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 20-21; Exhibit 1 (Staten employment application dated July 3, 2000).

months thereafter, until she began her employment with defendant.[10]

**B.      Plaintiff's Initial Job Duties and Pay With Defendant**

Defendant hired plaintiff on August 18, 2000, to work as a "receptionist/intake coordinator" at its rehabilitation center in Huntsville, Alabama. In that position, plaintiff was responsible for working at the front desk, scheduling appointments, interviewing patients, verifying insurance, and performing other administrative tasks.[11]  Her beginning wage was $8.00 an hour.[12]  She received a merit-based pay-raise, three months later, during November of 2000, to $8.16 an hour.[13]

**C.      Racially-Offensive Comments by Plaintiff's Supervisor**

**1.      Comments uttered to plaintiff**

Plaintiff's supervisor during her approximately eight-month tenure at HealthSouth's rehabilitation center was Site Coordinator Eric Myers, a Caucasian male.[14]  Plaintiff worked with Myers at least two to three days a week.[15]  Almost every day that plaintiff worked with Myers, he made comments which plaintiff interpreted as being racially offensive.[16]  For example, Myers occasionally referred to African-Americans as "your kind," or "your

---

[10] *Id.* at Exhibit 1 (Staten employment application dated July 3, 2000); Exhibit 2 (job offer letter dated August 18, 2000).

[11] *Id.* at 84-87.

[12] *Id.* at Exhibit 2 (job offer letter dated August 18, 2000).

[13] *Id.* at 77.

[14] *Id.* at 81, 106.

[15] *Id.* at 153-54.

[16] *Id.*

people."[17]   Additionally, Myers often spoke to plaintiff in a manner which mimicked stereotypical African-American slang, uttering such phrases as "what you be doing?," "how you be?," "wassup?," and "what it is?"[18]   At deposition, plaintiff explained that Myers "would change his voice . . . as if he was trying to sound 'black' and use broken grammar to talk to me[,] but [he used] correct grammar when he talked to someone else."[19]

In October of 2000, plaintiff heard a patient state that "all black people *look* alike."[20] Plaintiff reported the incident to Myers, who responded by saying "well, it's true . . . you do *act* alike and *sound* alike."[21]

During November of 2000, Myers asked plaintiff how she voted on a proposed amendment on the electoral ballot regarding interracial marriages.[22]   Plaintiff responded that she did not vote on the matter.   Myers then said "well, I don't agree with it," and walked away.[23]

---

[17] *Id.* at 158.

[18] Plaintiff's brief opposing summary judgment, at 14; defendant's evidentiary submissions, Tab 1 (Staten deposition), at 153.

[19] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 150-51.

[20] *Id.* at 189 (emphasis supplied); *see also* Exhibit 5 (plaintiff's typewritten notes), at ¶ 1.

[21] *Id.* at 189 (emphasis supplied).

[22] There is nothing in the record to specify exactly what amendment this comment concerned. However, based on the time period during which Myers' comment was made, the court assumes the comment was referring to the initiative during the November 2000 election to repeal the provision in the Alabama Constitution forbidding the legalization of interracial marriages within the state.   The pertinent section of the Alabama Constitution used to read, "The legislature shall never pass any law to authorize or legalize any marriage between any white person and a negro, or descendant of a negro." Ala. Const. art. IV, § 102 (1901). The Supreme Court ruled in 1967 that such bans on interracial were unconstitutional. *See Loving v. Virginia,* 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 (1967).   Nonetheless, Alabama's law remained on the books, until it was repealed in November of 2000.   *Alabama Repeals Century-Old Ban on Interracial Marriages,* CNN, *at* http://www.cnn.com/2000/ALLPOLITICS/stories/11/07/alabama.interracial/ (November 8, 2000).

[23] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 186, 188.

Plaintiff never confronted Myers about his comments, except on the occasion when he opined that all African Americans "act" and "sound alike." Even on that occasion, however, she merely stated that she "was curious why he would think that."[24]

## 2.    Comments uttered to another employee

Plaintiff also submits the testimony of a fellow employee, Letitia Troupe, who claims that she heard Myers utter several racially-discriminatory statements. Troupe was employed by defendant as a "floating" intake coordinator/receptionist, which required her to work not only at the rehabilitation center, but also at three other HealthSouth facilities in the area.[25] As a "floater," Troupe sometimes worked with Myers.[26]

Troupe explains that Myers "would make comments of a racially derogatory nature[,] such as 'Wassup' and 'Black men cheat, white men don't.'"[27] Troupe also heard Myers compare the dressing habits of Caucasian and African American professional football players, asking "what the 'do rag' was all about."[28]

Troupe and Myers both participated in the process through which plaintiff was hired by defendant. She explains that plaintiff and a Caucasian female were interviewed for the position that plaintiff ultimately was selected to fill. After the interviews were completed, Myers stated that, "with Letitia [Troupe] we already have one *sister* and we don't need

---

[24] *Id.* at 152.

[25] Plaintiff's evidentiary submissions, Tab 1 (Troupe declaration) ¶ 1.

[26] *Id.,* at ¶¶ 1-2.

[27] *Id,* at. ¶ 2.

[28] *Id.*

another."[29]  Troupe complained about the comment to Myers's supervisor, Scott Johnson, who said that he would "take care of [Myers]."  At some point thereafter, Myers instructed Troupe "to just hire the black girl, referring to [plaintiff]."[30]

## D.   Plaintiff's Complaints Regarding Myers

Plaintiff first complained about Myers's comments to Myers's supervisor, Scott Johnson, during February of 2001, approximately six months after she was hired.[31]  Johnson responded by verbally counseling Myers and warning him that any further, inappropriate comments could result in his being placed on probation or terminated.[32]

Myers was undeterred, however, and continued to speak to plaintiff in a manner which mimicked stereotypical African-American slang.  Additionally, on March 1, 2001, a Caucasian male came to the rehabilitation center to visit plaintiff.[33]  Myers later told plaintiff, "Irene, there was a tall white man looking for you," and then asked whether the man was a bill collector.[34]  Plaintiff was embarrassed and offended by Myers's comments, because they were made in front of several people, and she believed that Myers's question reflected an offensive stereotype "that all black people don't pay their bills."[35]

Plaintiff lodged a second complaint against Myers with Johnson in March of 2001,

---

[29] *Id.*, at ¶ 4 (emphasis supplied).

[30] *Id.*, at ¶ 4.

[31] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 206, 209; defendant's brief in support of summary judgment, at 2-3.

[32] Defendant's evidentiary submissions, Tab 3 (Johnson deposition), at 151-53.

[33] *Id.*, Tab 1 (Staten deposition), at 217-18; Exhibit 5 (plaintiff's typewritten notes), at ¶ 6.

[34] *Id.* at 196.

[35] *Id.*

explaining that "nothing has changed."[36] Johnson again promised to speak with Myers.[37] On

April 1, 2001, plaintiff telephoned Market Coordinator (and Johnson's supervisor) Rhonda

Eckstein, to complain about Myers's statements.[38] Eckstein met with plaintiff "the same day

or the day after" she telephoned.[39] Eckstein then spoke with Myers and issued him a written

counseling statement on April 2, 2001. On the counseling form, Eckstein wrote that "racial

comments are unacceptable in the workplace," and "[f]uture occurrences will result in

immediate termination."[40] She contemporaneously placed Myers on probation for a ninety-

day period.[41]

In an effort to accommodate plaintiff, Eckstein gave her the opportunity to transfer

to defendant's local diagnostic center.[42] Plaintiff accepted the offer, and transferred soon

thereafter.[43] Following plaintiff's complaint to Eckstein, and plaintiff's subsequent transfer

to the diagnostic center, Myers' comments ceased.[44]

## E.    Plaintiff's Tenure at the Diagnostic Center

Upon her transfer to the diagnostic center, plaintiff's wage was increased to $9.00 an

hour, for the purpose of bringing her hourly wage into conformity with that location's higher

---

[36] *Id.* at 219.

[37] *Id.*

[38] *Id.* at 219-20; defendant's brief in support of summary judgment, at 3.

[39] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 221.

[40] Plaintiff's evidentiary submissions, Tab 4 (excerpts from Myers personnel file), at documents bearing Bates Stamp numbers STATEN 00298 through 00301.

[41] Defendant's evidentiary submissions, Tab 5 (Eckstein deposition), at 71.

[42] *Id.*, Tab 1 (Staten deposition), at 222-24.

[43] *Id.* at 225.

[44] *Id.* at 233.

pay scale.[45]   Plaintiff's job duties were similar to those she had performed at the rehabilitation center.[46]   She received a merit-based pay-raise to $9.18 an hour during October of 2001.[47]

## F.   Discriminatory Statements Uttered by Plaintiff

On one unspecified occasion during her employment with defendant, plaintiff uttered the racial epithet "nigger."[48]   She could not recall the context in which she used the word, but says that she "immediately apologized for saying that word."[49]

During July of 2001, two of plaintiff's co-workers at the diagnostic center (one of whom was African-American and the other Caucasian) complained that plaintiff had made discriminatory comments about them.  First, 59-year-old Caucasian female Helen Deibler asserted that, during July of 2001, plaintiff told her, "you don't belong here."  Deibler added that plaintiff corrected her in the presence of patients, and asked "can't she do anything right?"[50]   Plaintiff also referred to Deibler as "Grandmother" on one occasion,[51] which Deibler believed was a disparaging reference to her age.[52]   Second, Christy Goode, an African-American female, complained that she overheard plaintiff state during a telephone

---

[45] *Id.* at 88.

[46] *Id.* at 88, 93-94.

[47] Defendant's evidentiary submissions, Tab 3 (Johnson deposition), at Exhibit 6 (employee pay spreadsheets), at document bearing Bates Stamp number STATEN 00343.

[48] *Id.*, Tab 1 (Staten deposition), at 159.

[49] *Id.* at 158-60.

[50] Plaintiff's evidentiary submissions, Tab 9 (documentation of plaintiff's discriminatory statements), at document bearing Bates Stamp number STATEN 00070.

[51] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at Exhibit 7 (Plaintiff's letter to EEOC dated Sept. 19, 2001), at unnumbered page 2.

[52] *Id.*

conversation, "I don't like working with black people." At deposition, plaintiff admitted that she made such a statement.[53]

In response to Deibler and Goode's complaints, Eckstein and the diagnostic center's administrator, Cheryl Dutton, met with plaintiff on July 13, 2001.[54] Eckstein and Dutton issued plaintiff a written counseling statement, warning her not to make any further comments that reflected a disparaging attitude about her co-employees' age or race. The counseling form also assigned plaintiff an overall performance rating of "1," which, under Health-South's discipline policy, automatically imposes probation on the employee, for a period not to exceed ninety days.[55] Plaintiff was cautioned that, "if this behavior continues she may be terminated."[56] Plaintiff refused to sign the form.[57]

## G.    Plaintiff's Resignation

Plaintiff requested, and received, a transfer to an insurance clerk position in defendant's diagnostic center during December of 2001.[58] Soon thereafter, she went on medical leave. While still on medical leave during January of 2002, plaintiff resigned her employment with defendant for the purpose of accepting a job offer with another health care

---

[53] Id., Tab 1 (Staten deposition), at 161.

[54] Plaintiff's evidentiary submissions, Tab 9 (documentation of plaintiff's discriminatory statements), at documents bearing Bates Stamp numbers STATEN 00071 to 00074.

[55] Id. at documents bearing Bates Stamp numbers STATEN 00111 to 00112.

[56] Id. at documents bearing Bates Stamp numbers STATEN 00071 to 00074.

[57] Id.

[58] Defendant's brief in support of summary judgment, at 5; defendant's evidentiary submissions, Tab 3 (Johnson deposition), at Exhibit 6 (employee pay spreadsheets), at document bearing Bates Stamp number STATEN 00343.

provider, where she would earn a significantly higher salary.[59]

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but also that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

---

[59] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 38.

## III. DISCUSSION

**A.     Race Discrimination**[60]

Plaintiff's amended complaint cast a wide net, asserting that she "has been discriminated against on the basis of race in regard to termination, promotion, job assignments, job pay, and other adverse terms and conditions of employment, has been subjected to a racially hostile work environment, and has been retaliated against in violation of Title VII."[61]

### 1.     Abandonment of termination, promotion, and job assignment claims

At the summary judgment stage, however, plaintiff effectively abandoned her termination, promotion, and job assignment claims.  Plaintiff has offered *no* response to defendant's well-supported arguments that summary judgment should be granted on her termination, promotion, and job assignment claims.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g., Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim

---

[60] The substantive analysis of plaintiff's race discrimination claim is the same under both Title VII and 42 U.S.C. § 1981. *See Vance v. Southern Bell Telephone & Telegraph Co.,* 983 F.2d 1573, 1579 n.3 (11th Cir. 1989) ("[T]he legal elements of a disparate treatment claim are identical under Title VII and § 1981.") (citing *Lincoln v. Board of Regents of University System,* 697 F.2d 928, 935 n. 6 (11th Cir. 1983)); *see also Hamilton v. Rodgers,* 791 F.2d 439, 442 (5th Cir. 1986), *overruled on other grounds by Harvey v. Blake,* 913 F.2d 226, 228 n.2 (5th Cir. 1990) (holding that, when sections 1981 and 1983 "are used as parallel causes of action with Title VII, they require the same proof to show liability").

[61] Amended complaint, at ¶ 18.

alleged in the complaint but not even raised as a ground for summary judgment") (citing

*Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground

not pressed in opposition to a motion for summary judgment is to be treated by the district

court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his
> pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating
> Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on
> the district court to distill every potential argument that could be made based
> upon the materials before it on summary judgment. *Blue Cross & Blue Shield
> v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the
> parties to formulate arguments; grounds alleged in the complaint but not relied
> upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations

omitted).[62]

Plaintiff did offer argument in opposition to summary judgment regarding those

portions of her race discrimination claim asserting that she was subjected to a hostile work

environment and disparate pay, and the merit of those claims will be examined below.[63]

### 2.    Hostile work environment

Plaintiff asserts that Myers's comments, detailed in § I(C) *supra*, created an actionably

---

[62] *Cf., e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

[63] Plaintiff's retaliation claim will be examined in § III(B) *infra*.

hostile work environment.

Plaintiff must demonstrate five elements to establish a racially-hostile work-environment claim: *i.e.*, (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon her race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatory abusive working environment; and (5) her employer is liable for the environment under a theory of either direct or vicarious liability. *See, e.g., Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002); *Bivins v. Jeffers Vet Supply,* 873 F. Supp. 1500, 1507 (M.D. Ala. 1994).

Plaintiff easily establishes the first three elements. As an African-American female, she belongs to a protected group. Further, all of Myers' comments were unwelcome, and related to plaintiff's race.

### a.    Severe or pervasive

The fourth element requires more careful consideration. The requirement that the alleged harassment must be sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment contains both an objective and a subjective component. To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993).

When evaluating the objective severity of offensive conduct, courts examine the

-13-

totality of circumstances, including such factors as: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. *See, e.g., Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995); *Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)). It is not necessary to prove each of the factors individually. However, the factors, taken together, must reveal conduct which is so extreme that it caused a material change in the terms and conditions of plaintiff's employment and created a working environment that a reasonable person would find discriminatorily abusive. *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84, 141 L. Ed. 2d 662 (1998) (citations omitted).

None of Myers' comments were threatening. The courts which have found threatening behavior in a hostile work environment context have relied on comments far more intimidating and denigrating than those made by Myers. *See Walker v. Thompson,* 214 F.3d 615, 626 (5th Cir. 2000) (supervisor's comments comparing the African-American plaintiff to slaves and monkeys, and stating that plaintiff should be sent back to Africa, could reasonably be construed to be threatening or humiliating); *Lawrence v. Wal-Mart Stores, Inc.,* 236 F. Supp. 2d 1314, 1325 (M.D. Fla. 2002) (remarks by a supervisor to an African-American employee about lynching blacks and about a gun he had at home "to shoot blacks" were threatening).

-14-

There also is no evidence that the comments unreasonably interfered with plaintiff's job performance. "To show alteration of job performance, a plaintiff need not show tangible effects such as economic harm. However, the plaintiff must show some *material* alteration of job performance from a reasonable person's standpoint." *Lawrence*, 236 F. Supp. 2d at 1326 (internal citations omitted) (emphasis supplied). Plaintiff argues that her job performance was altered "when Myers made the comment that all black people look alike and act alike, [because she] was so upset, she had to go into the kitchen."[64] Even so, there is no evidence that this one incident materially affected plaintiff's performance, or ability to perform the duties of her job.

However, most of Myers' comments can reasonably be considered severe. In *Lawrence*, the court recognized that, even if comments are race-related, they will not be considered severe enough to create an actionable hostile work environment if "no reasonable person would conclude that [the person making the comments] was taunting or intimidating [p]laintiff just by [making the comment]," especially when the comments are not expressly directed toward the plaintiff. *Lawrence*, 236 F. Supp. 2d at 1325. Here, in comparison, Myers' comments *were* expressly directed toward plaintiff. His use of black slang and broken grammar could reasonably be considered as taunting plaintiff, especially when Myers spoke in such a manner almost daily.

---

[64] Plaintiff's brief opposing summary judgment, at 36. Plaintiff does not provide a citation to the record indicating the source of this comment. The court assumes, however, that plaintiff is referring to pages 192-93 of her deposition. *See* defendant's evidentiary submissions, Tab 1 (Staten deposition) at 192-93 ("I was upset about it and I was just going in the kitchen because the kitchen was just right behind the office.").

Myers' use of the terms "your people" and "your kind" is even more clearly severe. These clearly discriminatory terms might not be considered severe if Myers had uttered them only a few times. *See, e.g., Gipson v. KAS Snacktime Co.,* 171 F.3d 574, 579-80 (8th Cir. 1999) (comments, including references to African-Americans as "[plaintiff's] kind," were not actionable when they were made only three times during a two-month period); *Brown v. Parker Hannifin Corp.,* No. CIVA98-616CIV-ORL18C, 1999 WL 1449761 at *11 (M.D. Fla. Oct. 13, 1999) (use of terms "you people" and "your kind," in reference to plaintiff's race were not severe enough when only three comments were made during a three-month period). However, Myers' use of these terms *on an almost daily basis* unquestionably is severe, especially when considered in conjunction with the other racially derogatory comments Myers regularly made. *See Walker,* 214 F.3d at 626 (comments directed to African-American employee, including use of the terms "your people" and "black people," were severe enough when made repeatedly); *Santana v. Westaff, Inc.,* No. Civ. 02-572-KI, 2003 WL 21087731, at *4 (D. Or. May 5, 2003) (comments about a Hispanic employee's race, including use of the term "your people," were actionable when made approximately three times a month over a period of a couple of years); *Hussain v. Long Island Railroad Co.,* No. 00CIV.4207(THK), 2002 WL 31108195, at *7 (S.D. N.Y. September 20, 2002) (comments directed to Pakistani-born plaintiff, including use of the term "your people," were severe when made regularly and continuously over a two-year period). *See also Santana,* 2003 WL 21087731, at *4 (quoting *Brooks v. City of San Mateo,* 229 F.3d 917, 926 (9th Cir. 2000) ("The required showing of severity or seriousness of the harassing conduct varies

-16-

inversely with the pervasiveness or frequency of the conduct.").

The most important factor in evaluating the severity of Myers' conduct is the frequency with which his comments were made. Plaintiff worked with Myers two to three days a week for approximately eight months, and she was subjected to the comments almost every one of those days.[65] *See Lawrence,* 236 F. Supp. 2d at 1325 (citing *Miller,* 277 F.3d at 1276) (stating that, "[w]hile there is no magic number for frequency, 'repeated incidents of verbal harassment . . .'" satisfy the test); *Hansen v. Perry Tech, Inc.,* 206 F. Supp. 2d 1223, 1227 (S.D. Fla. 2002) (finding frequency when comments occurred "routinely"); *Santana,* 2003 WL 21087731, at * 4 (finding frequency when harassing comments occurred approximately three times a month over a period of several years). Further, the regular, continuous use of Myers' severely discriminatory comments would be humiliating to any reasonable person, especially when the comments often were made in front of several other people.

Considering the totality of the circumstances, the court finds that Myers' comments to plaintiff were sufficiently severe or pervasive to materially change the terms and conditions of plaintiff's employment. On any given day that plaintiff worked with Myers, she could reasonably be certain that she would be subjected to his severe, humiliating comments. Without question, any reasonable person would find such an environment to be discriminatory and abusive. Accordingly, plaintiff has satisfied the fourth element of her hostile work environment claim.

---

[65] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 153-54.

### b.   Defendant's liability for Myers conduct

Even though plaintiff has established the first four elements of her hostile work environment claim, defendant can still avoid liability on that claim if it can show that the theories of direct and vicarious liability do not apply to it. *See Miller*, 277 F.3d at 1275. Neither party has offered any argument on the issue of defendant's liability for Myers' harassment of plaintiff. Accordingly, the court is left to its own analysis.

> An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998). The employer will be strictly liable for the hostile environment if the supervisor takes tangible employment action against the victim. *See id.* at 807, 118 S. Ct. at 2293. However, when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S. Ct. at 2292-93.

*Miller*, 277 F.3d at 1278.

It is undisputed that plaintiff's harasser, Eric Myers, was her direct supervisor. Further, plaintiff did not suffer a tangible adverse employment action while under Myers' supervision. Accordingly, defendant may avoid liability by showing that (1) it exercised reasonable care both to prevent and to correct Myers' behavior, and (2) that plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendant to avoid the harm otherwise. "Both elements [of the affirmative defense] must

-18-

be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001).

The first element of the *Faragher/Ellereth* affirmative defense has two components, each requiring separate proof: (i) the employer must prove that it exercised reasonable care to *prevent* sexually harassing behavior in its workplace ("prevention prong"); and (ii) the employer also must prove that it exercised reasonable care to *correct promptly* any sexually harassing behavior occurring in its workplace ("remedial prong").

The court finds that defendant did not exercise reasonable care to correct Myers' behavior. Thus, it need not analyze whether plaintiff unreasonably failed to take advantage of any remedial measures offered by defendant, or whether she otherwise acted to avoid harm.

### i.    Prevention prong

Defendant has satisfied the prevention prong because it has established the following three facts: (1) it has "promulgated an effective and comprehensive" anti-harassment policy, *Miller*, 277 F.3d at 1279 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997)); (2) containing complaint procedures that are "'designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor,'" *Faragher*, 524 U.S. at 806, 118 S. Ct. at 2292;[66] and (3) the policy

---

[66] In the textual passage to which this note is appended, the *Faragher* Court was quoting *EEOC Policy Guidance on Sexual Harassment*, 8 FEP Manual 405:6699 (March 19, 1990), and the bracketed alteration was in the original. *See also Ellerth*, 524 U.S. at 764, 118 S. Ct. at 2270 (noting "EEOC's policy

was "aggressively and thoroughly disseminated" to its employees. *Miller*, 277 F.3d at 1279

(quoting *Farley*, 115 F.3d at 1154); *see also, e.g., Frederick*, 246 F.3d at 1314 (citing

*Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298-99 (11th Cir. 2000)) (holding that

an employer is "required to show that its sexual harassment policy was effectively published,

that it contained reasonable complaint procedures, and that it contained no other fatal

defect").

 The pertinent portions of defendant's anti-harassment policy, set forth in its employee

handbook, read as follows:

> HEALTHSOUTH is committed to maintaining a work environment that is free from
> unlawful discrimination and harassment. . . . HEALTHSOUTH prohibits unlawful
> discriminatory practices and harassment on the basis of sex, age, race, color, national
> origin, religion, disability or any other factor protected by law, whether the
> harassment is caused by another employee, supervisor, manager, or other person.
>
> . . . .
>
> *How to Report Instances of Harassment*
>
> Any employee who believes he or she is being subjected to unlawful
> harassment or discrimination . . . or who believes that his or her employment
> is being adversely affected by such conduct, is directed to report such incidents
> . . . [to the] employee's supervisor and the Human Resources Department. If
> the complaint or observation involves someone in the employee's direct line
> of command, or if for any reason the employee is uncomfortable discussing the
> matter with his or her direct supervisor or the Human Resources Department,
> the employee is directed to report the matter to Corporate Human Resources
> or any senior member of Administration.
>
> Additionally, any employee, manager or supervisor who becomes aware of any
> possible unlawful harassment or other violation of this policy, whether he or
> she is personally affected or not, is directed to advise his or her superior, the

of encouraging the development of grievance procedures," and citing the same publication).

Human Resources Department or any senior member of Administration.

*How an Investigation Will Be Conducted*

HEALTHSOUTH will conduct a prompt and thorough investigation of the complaint or observation of possible unlawful harassment or discrimination and take appropriate action based on its investigation

. . . .

Employees will be subject to disciplinary action, which may include discharge, for violations of this policy including, but not limited to, harassing or retaliating conduct, failure or refusal to cooperate in a harassment investigation or other actions contrary to the policy.

Finally, if an employee believes that his or her report or complaint of a possible violation of this policy has not been promptly or properly addressed or the employee otherwise feels that HEALTHSOUTH or his or her facility has not met its obligations under the policy, the employee should immediately contact Corporate Human Resources.[67]

Defendant's anti-harassment policy is effective and comprehensive because it is "designed to stop the harassment, correct its effects on the employee, and ensure that the harassment does not recur." *Walton v. Johnson & Johnson Services, Inc.,* 347 F.3d 1272, 1288 (11th Cir. 2003) (citation omitted). Defendant's policy provides clear, detailed provisions that sufficiently alert its employees to the proper procedures they should follow if they feel victimized by a co-worker's or supervisor's harassment. The policy allows an employee to carry his or her complaint through successively higher levels of defendant's administration, if the employee is not satisfied with the reaction he or she receives at a lower level. Further, the provision allowing for disciplinary action, including termination, is

---

[67] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at Exhibit 4 (HealthSouth Employee Handbook), at 17-18 (all caps and italicized emphasis in original).

designed to ensure that the harassment will not recur.

The policy also allows an employee to bypass an offending supervisor when making a complaint. The complaining employee may direct his or her complaint to the Corporate Human Resources Department, or to "any senior member of Administration," if the employee feels uncomfortable complaining to his or her direct supervisor or to the on-site Human Resources Department.

Finally, the policy is well-disseminated among defendant's employees. Defendant's new employees view videos about the policy and procedure manual shortly after commencing their employment.[68] Employees also may call a toll-free telephone number to report any violations of company policy, including harassment.[69] The toll-free number is posted in all of defendant's facilities, and it was posted "over the refrigerator in the break room" at the rehabilitation center facility where plaintiff worked with Myers.[70] The number is also printed on business cards, which are handed out to all of defendant's employees.[71]

## ii. Remedial prong

Defendant thus had an effective anti-harassment policy in place which would have relieved it from liability for Myers' harassment of plaintiff, if only the policy had been followed when plaintiff lodged her first complaint with Scott Johnson.

The second, or "remedial," prong of the first element requires the employer to exercise

---

[68] Plaintiff's evidentiary submissions, Tab 5 (Myers deposition), at 21.

[69] *Id.* at 25-26.

[70] *Id.*

[71] *Id.*

reasonable care to promptly correct any sexually harassing behavior. "[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick,* 246 F.3d at 1314 (citing *Madray,* 208 F.3d at 1302).

Plaintiff lodged her first complaint with Johnson, Myers' supervisor, on February 26, 2001. Johnson told plaintiff that he had spoken to Myers about his behavior in the past and, "that he [Myers] didn't mean anything by it."[72] Johnson immediately confronted Myers and conducted a quick verbal counseling session with him regarding the comments. He warned Myers that continuing to make the comments could result in his probation or termination. However, he did not make any written notation of the session, as required by defendant's disciplinary procedures,[73] and he did not report the incident to any of his superiors, as required by defendant's anti-harassment policy.[74] Johnson did not follow up on the situation, and no further disciplinary action was taken against Myers at that time.

Despite Johnson's warning, Myers' comments continued. The second time plaintiff complained to Johnson, in March of 2001, Johnson again promised to speak with Myers. The record does not clearly reflect whether Johnson actually did so, but it does reflect that Myers' comments still did not cease at that time. Indeed, the comments did not cease until after plaintiff complained about Myers to Rhonda Eckstein on April 1, 2001. The day after receiving plaintiff's complaint, Eckstein issued a written counseling statement to Myers and

---

[72] *Id.* at 210.

[73] *See* plaintiff's evidentiary submissions, Tab 5, at document bearing Bates Stamp number STATEN 00100.

[74] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at Exhibit 4 (HealthSouth Employee Handbook), at 17-18 (all caps and italicized emphasis in original).

placed him on probation.

Defendant has failed to prove that it exercised reasonable care to promptly correct Myers' harassing behavior. More than one month elapsed between plaintiff's first complaint to Johnson and the time that Myers was properly disciplined for his behavior. Although Johnson spoke to Myers promptly after plaintiff's first complaint, he failed to follow defendant's policy for imposing discipline on Myers and reporting the incident to his superiors. Further, Johnson's quick verbal counseling session with Myers clearly was inadequate to correct Myers' behavior, because, after the conversation, Myers continued make the offensive comments. Even after plaintiff complained to Johnson a *second* time, Myers was not adequately disciplined. Plaintiff was left to suffer through an entire extra *month* of Myers' harassing behavior before her complaint received adequate attention from defendant's administrative employees. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001) (employer could not avoid liability when its supervisory employees did not follow its harassment policy with regard to reports of harassment, and when the harassing behavior continued); *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998) (defendant's response to employee's harassment complaint was inadequate when the supervisor to whom the complaint was made only spoke with the offending employee, but did not report the incident to the defendant's Human Resources Department, as required by the defendant's harassment policy).

Defendant's comprehensive and potentially effective anti-harassment policy is of no use to it in this case, because Johnson failed to follow that policy in responding to plaintiff's

complaint.   Thus, defendant cannot avoid liability for Myers' harassment of plaintiff. Plaintiff has established all elements of her hostile working environment claim, and summary judgment on that claim is due to be denied.

### 3.    Racially-disparate pay

Plaintiff also claims that she was discriminated against on the basis of her race because she was paid less than six Caucasian receptionist/intake coordinators: Amanda Corley, Brandie Lawrence, Amy Ausley, Christy Lee, Helen Deibler, and Carolyn Junkins. "To establish a prima facie case of racial discrimination with respect to compensation, the plaintiff must show that [s]he was paid less than a member of a different race was paid for work requiring substantially the same responsibility." *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1074 (5th Cir. 1981).   Defendant does not dispute that plaintiff has established a prima facie case as to any of her comparators.[75]   Accordingly, the court proceeds to examine whether defendant's proffered nondiscriminatory reasons for each pay differential have been shown to be pretextual.

---

[75] *See* defendant's brief in support of summary judgment, at 13 n.17 ("For summary judgment purposes, Defendants do not dispute that, as to these employees, Plaintiff has established a *prima facie* case."). Defendant's initial brief does not mention Carolyn Junkins as a comparator, but since it is undisputed that she is a Caucasian female receptionist/intake coordinator who was paid a higher starting hourly wage than plaintiff, a prima facie case is readily established as to her, as well.

Plaintiff's brief opposing summary judgment vaguely mentions two individuals named Lori Daniels and Judy Jackson. Plaintiff's brief opposing summary judgment, at 7, 9. She does not, however, provide any argument that she was paid less than either person because of her race. Accordingly, summary judgment is due to be granted on any part of her race discrimination claim based on her comparison to either Daniels or Jackson. *See, e.g., Chapman*, 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Lazzara*, 802 F.2d at 269 (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned).

### a.    Amanda Corley

Corley was first hired by rehabilitation center Facility Administrator Scott Johnson in April of 1999, at a pay rate of $7.50 an hour.  She later received a raise to $7.65 an hour. She resigned from that position in February of 2000, for the purpose of accepting a higher-paying job elsewhere.  A few months later, in May of 2000, Johnson sought to re-hire Corley because she was "an excellent receptionist/intake coordinator."  Corley refused to return to work for defendant unless she was paid a salary comparable to that which she then was making.  Johnson eventually re-hired Corley at a rate of $10.00 an hour, and assigned her additional workplace duties.[76]

The record reflects no evidence to rebut defendant's proffered reason for paying Corley the salary it did.  Instead, plaintiff only muses that the "[c]redibility of the entire declaration by Scott Johnson with regard to hiring is at issue because of his deposition testimony that he did not remember the pay negotiations for a lot of the hires that he made."[77] Even so, Johnson's admission that he did not remember the negotiations for some of his hiring decisions does not, alone, render the facts that he *does recall* pretextual.[78]

### b.    Brandie Lawrence

Lawrence was first hired by Johnson in September of 2000.  Johnson initially offered her a starting wage of $8.00 an hour, but Lawrence refused to work for any amount less than

---

[76] Johnson declaration (appended to doc. no. 34), at ¶ 3.

[77] Plaintiff's brief opposing summary judgment, at 26.

[78] Defendant's evidentiary submissions, Tab 3 (Johnson deposition), at 110.

$8.50 an hour, because she would have to commute to work from her residence in Athens, Alabama.[79]

Plaintiff again offers no evidence that defendant's proffered reason for paying Lawrence a starting wage of $8.50 an hour is pretextual.  While plaintiff's brief vaguely states that her own testimony "as to Brandie Lawrence's willingness to travel to Huntsville . . . demonstrates issues of facts to be resolved," she does not provide a citation to the record identifying this "testimony."[80]  The court assumes that plaintiff is referring to her declaration, wherein she states that "Ms. Lawrence knew she was interviewing for a job in Huntsville when she applied, and was already willing to driving [sic] from Athens to Huntsville when she interviewed."[81]  Such a statement is not helpful to prove pretext:  of course Lawrence knew that the job interview was in Huntsville; and, since she drove there for the interview, she was willing to do so.  That, however, does nothing to cast doubt on Johnson's statement that Lawrence demanded to be paid $8.50 an hour after being offered the job, given the distance she would be required to commute.  The record is replete with examples of Johnson negotiating salaries with new hires, including plaintiff.[82]

---

[79] Johnson declaration (appended to doc. no. 34), at ¶ 5.

[80] Plaintiff's brief opposing summary judgment, at 27.

[81] Plaintiff's evidentiary submissions, Tab 2 (Staten declaration), at ¶ 5.

[82] Plaintiff's deposition testimony reinforces the premise that she has no evidence to rebut defendant's proffered nondiscriminatory reason for Brandie Lawrence's starting wage:

Q:    As far as Brandie Lawrence is concerned . . . do you have any knowledge or information or understanding from any source as to how that came about, in other words, what the circumstances were that led to her having a higher hourly rate?

A:    No, sir.

### c.    Amy Ausley

Johnson explains that he hired Amy Ausley because, "after placing several advertisements in the newspaper, I could not find even a minimally acceptable applicant to fill a receptionist/intake coordinator vacancy in Huntsville." Johnson adds that, because he "desperately needed" to fill the position, and Ausley refused to accept employment at a pay rate of less than $9.25 an hour, he was compelled to hire her at that wage. Ausley proved to be an unsatisfactory employee, however, and her employment was terminated soon after she was hired.[83]

Again, plaintiff has failed to rebut defendant's proffered legitimate reasons for paying Ausley at a higher rate than it paid her. Plaintiff only asserts, "[e]vidence showing that [defendant] paid a less qualified applicant more than the plaintiff *may* be probative of whether [defendant's] proffered reason for not paying [plaintiff] as much as Caucasian employees was pretextual."[84]

Plaintiff cannot prove pretext simply by showing that she was better qualified than the person who received a higher salary. Rather, Eleventh Circuit precedent "requires a strong showing of a disparity in qualifications in order for an inference of discrimination to arise." *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001). "To show pretext, [plaintiffs] must show more than superior qualifications; rather, they must show that they were so much more qualified that the disparity virtually jumps off the page and slaps one in

Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 118-19.

[83] Johnson declaration (appended to doc. no. 34), at ¶ 6.

[84] Plaintiff's brief opposing summary judgment, at 27 (emphasis supplied).

-28-

the face." *Walker v. Prudential Property and Casualty Insurance Co.*, 286 F.3d 1270, 1277 (11th Cir. Mar. 2002) (citing *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253-54 (11th Cir. 2000)).

Plaintiff has not shown a great enough disparity between her qualifications and those of Amy Ausley to prove that defendant's proffered, non-discriminatory reason for paying Ausley at a higher rate actually was a pretext for race discrimination.

### d.     Christy Lee

Market Coordinator Rhonda Eckstein explained the circumstances surrounding Christy Lee's hire as follows:

> Christy Lee was hired at the Diagnostic Center in September 2001 at a rate of $9.75 per hour. Ms. Lee was hired based on the strong recommendation of the Diagnostic Center's business manager, Joette Thrower. Ms. Lee worked as the receptionist/check out at Ms. Thrower's asthma specialist [*sic*]. She worked a very busy front desk for two separate medical groups. The asthma specialist for whom Ms. Lee worked was also one of the Diagnostic Center's top referrals and a well-respected medical group. *Ms. Lee would not leave her employment with the asthma specialist for less than $9.75 per hour.* I hired Ms. Lee at this rate based on her experience and skills, and the strong recommendation from Ms. Thrower."[85]

Plaintiff seeks to cast doubt on defendant's proffered reason by referring to Christy Lee's declaration, wherein she states:

> 1.     When I interviewed for the position with HealthSouth for which I was hired in September 2001, I said that I would not accept the position for less than *$9.00* per hour.
>
> 2.     When Cheryl Dutton [administrator of the diagnostic center] called to

---

[85] Defendant's evidentiary submissions, Tab 6 (Eckstein declaration), at ¶ 7 (emphasis supplied).

offer the job to me, she offered me $*9.75* per hour.[86]

Defendant responds to Lee's declaration by saying that, while Lee may have agreed

to accept a wage of $9.00 an hour during her job interview (which Eckstein apparently did

not attend), that message was not accurately relayed to Eckstein.[87] If Eckstein was aware that

Lee would accept the position for a pay rate of $9.00 an hour when she decided to hire her

at a rate of $9.75 an hour, that might be sufficient to establish pretext. Thus, the conflict

between Eckstein's and Lee's testimony presents a genuine issue of material fact on the issue

of whether defendant's proffered reasons for hiring Lee at a rate of $9.75 an hour are a mere

pretext for race discrimination.

### e.    Helen Deibler

Deibler was hired by Rhonda Eckstein to work at the rehabilitation center during April

of 2001. Her starting wage was $11.00 an hour. Eckstein asserts that the following

circumstances dictated Deibler's hourly wage:

> Ms. Deibler was hired at this higher rate because she had spent nine years
> working as the office manager of a very busy and well-respected physician
> practice in Huntsville. Prior to that, Ms. Deibler had worked for three years
> as an office manager at a local hospital and for twenty-one years as an assistant
> office manager at another hospital. *In addition, Ms. Deibler was making over
> $13.00 per hour at the physician's office.* She would not come to work for
> HealthSouth for less than $11.00 per hour. I determined that we should pay
> Ms. Deibler this rate based on her many years of experience, her established
> record of long-term employment, and her apparent maturity and stability.[88]

Plaintiff offers no identifiable evidence to rebut defendant's proffered reason for paying

---

[86] Plaintiff's evidentiary submissions, Tab 3 (Lee declaration), at ¶¶ 1-2 (emphasis supplied).

[87] Defendant's reply brief, at 8.

[88] Defendant's evidentiary submissions, Tab 6 (Eckstein declaration), at ¶ 5.

Deibler a starting wage of $11.00 an hour.

###### f.      Carolyn Junkins

Junkins also was hired by Rhonda Eckstein to work at the Rehabilitation Facility during April of 2001. Her starting wage, like Helen Deibler's, was $11.00 an hour. Eckstein proffers the following facts to explain why Junkins was paid that starting wage:

> Ms. Junkins had worked for two years as a clinical technician at a very busy cardiac rehabilitation and diagnostic center.   In addition to manning telephones, coordinating scheduling, and taking patient information for charting and insurance, Ms. Junkins assisted with patient rehabilitation.  Prior to this position, Ms. Junkins worked for nine years at a local hospital, answering telephones, editing payroll, overseeing clerical responsibilities and supervising expense reports.  Ms. Junkins indicated that her minimum salary demand was $11.00 per hour.  I hired Junkins at that rate based on her years of experience and the longevity of her employment with prior medical employers and her obvious maturity and stability.[89]

Plaintiff attempts to cast doubt on the credibility of defendant's stated reason by comparing Junkins's level of experience to her own.  Plaintiff states that she "had spent at least five years with one medical employer and had eight years total medical experience at the time she was hired in at $8.00 an hour."[90]  Such an argument is not helpful to prove pretext, because plaintiff admits that Junkins possessed at least three more years of "medical experience" than she did.  There is no evidence, either offered by plaintiff, or in the record, that race, and not greater experience or employment stability, was defendant's true reason for paying Junkins at a higher rate than it paid plaintiff.

Plaintiff has demonstrated a genuine issue of material fact with regard to her claim

---

[89] Defendant's evidentiary submissions, Tab 6 (Eckstein declaration), at ¶ 6 (emphasis supplied).

[90] Plaintiff's brief opposing summary judgment, at 26.

that defendant paid her less than Christy Lee because of her race. Accordingly, summary judgment cannot be granted on that claim. Plaintiff has not shown that any of defendant's proffered legitimate, non-discriminatory reasons for paying any of the other comparators at a higher rate than it paid her are a mere pretext for racial discrimination. Accordingly, summary judgment is due to be granted on plaintiff's disparate pay claim, with regard to all of her comparators, other than Christy Lee.

## B.     Retaliation

Plaintiff claims that the negative performance appraisal she received on July 13, 2001 was issued in retaliation for her earlier complaints of racial harassment by Eric Myers.[91]

"Retaliation is a separate violation of Title VII."[92] *Gupta,* 212 F.3d at 586. A plaintiff generally must prove three elements to establish a prima facie case of retaliation: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Bass v. Board of County Commissioners,* 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501,

---

[91] Plaintiff also claims defendant retaliated against her for writing a letter outlining her discrimination complaint to the EEOC on April 23, 2001. Plaintiff's brief opposing summary judgment, at 28. Defendant contends this aspect of plaintiff's retaliation claim should not be considered, however, because it was not included in the charge she filed with the EEOC. Defendant's reply brief at 12. Even if plaintiff *had* included the retaliation based on her letter in her EEOC charge, it would not be actionable, because, as discussed, plaintiff did not suffer any adverse employment action.

[92] This analysis is equally applicable to that portion of plaintiff's retaliation claim based upon § 1981. *See, e.g., Sullivan v. National Railroad Passenger Corp.,* 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and § 1981 with a single analysis); *Moss v. W & A Cleaners,* 111 F. Supp. 2d 1181 (M.D. Ala. 2000); *Holiness v. Moore-Handley, Inc.,* 114 F. Supp. 2d 1176, 1185 (N.D. Ala. 1999).

507 (11th Cir. 2000); *Gupta*, 212 F.3d at 587.

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted).

Plaintiff cannot establish a prima facie case because the negative performance appraisal she received does not rise to the level of an adverse employment action. An adverse employment action is "an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives . . . her of employment opportunities, or adversely affects . . . her status as an employee." *Hudson v. Norfolk Southern Railway Co.*, 209 F. Supp. 2d 1301, 1334 (N.D. Ga. 2001) (citing *Gupta*, 212 F.3d at 587). "Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause'" of Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)).

"Although adverse employment actions may include reprimands . . . the action in question must have more than a tangential effect on the ultimate employment decision . . . . Indeed, the conduct in question must rise to a substantial level before it can be cognizable as unlawful discrimination." *Hanley v. Sports Authority*, 143 F. Supp. 2d 1351, 1356 (S.D.

-33-

Fla. 2000) (discussing a racially-disparate treatment claim) (citing *Wideman*, 141 F.3d at 1456; *Mattern v. Eastman Kodak,* 104 F.3d 702, 708 (5th Cir. 1997); *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir. 1994)); *see also Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (holding that unfair reprimands or negative performance evaluations of employee, unaccompanied by some tangible job consequence, do not constitute adverse employment actions); *Oest v. Illinois Department of Corrections,* 240 F.3d 605, 613 (7th Cir. 2001) (holding that, even though "each oral or written reprimand brought [plaintiff] closer to termination," they still did not form an independent basis for liability under Title VII because, "absent some tangible job consequence accompanying the reprimands, we decline to broaden the definition of adverse employment action to include them.") (internal quotation marks and citation omitted).

Here, plaintiff suffered no tangible consequence from the negative performance appraisal she received. Specifically, plaintiff was not suspended; she did not lose any pay; and she was not terminated.[93] Instead, she received a two-percent merit pay increase in October of 2001, only a few months after the performance appraisal was issued.[94] Further,

---

[93] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 246. Plaintiff also stated in her deposition that she did not get put on probation. *See id.* However, defendant's policy dictates that all employees who receive a rating of "1" on a performance appraisal are automatically placed on probation, for a period not to exceed ninety days. Plaintiff's evidentiary submissions, Tab 9 (documentation of plaintiff's discriminatory statements), at documents bearing Bates Stamp numbers STATEN 00111 to 00112. Further, plaintiff bases a portion of the retaliation section of her brief on the fact that she was placed on probation. *See* plaintiff's brief opposing summary judgment, at 29-30. Thus, the court cannot conclude that plaintiff was not placed on probation. However, the court finds no evidence that plaintiff was placed on any *additional* probation, beyond the initial, automatic period.

[94] Defendant's evidentiary submissions, Tab 3 (Johnson deposition), at Exhibit 6 (employee pay spreadsheets), at document bearing Bates Stamp number STATEN 00343.

in December of 2001, plaintiff was granted the transfer, *which she had requested*, to an insurance clerk position.[95]

Plaintiff argues that her inability to receive a pay increase, transfer, or promotion during her probationary period constitutes an adverse employment action.[96]   Defendant's policy prevents employees who are placed on performance-related probation from receiving merit-based pay increases.[97]   However, the policy also provides that merit-based pay increases generally are given to defendant's employees in October of each year.[98]   Plaintiff was placed on a ninety-day probation in July of 2001, and the probation ended in October of 2001.[99]   Plaintiff received her annual merit-based pay increase, on schedule, in October of 2001.   Thus, plaintiff's probationary status did not prevent her from receiving a pay increase.   The probation also did not prevent plaintiff from receiving a promotion, because plaintiff admits that she did not apply for any promotion while she was employed by defendant.[100]   *See Walker,* 286 F.3d at 1275 (emphasizing that the failure to promote an employee is not actionable if the employee does not apply for the promotion).

Based on the foregoing, the performance appraisal plaintiff received in July of 2001

---

[95] Defendant's brief in support of summary judgment, at 5; defendant's evidentiary submissions, Tab 3 (Johnson deposition), at Exhibit 6 (employee pay spreadsheets), at document bearing Bates Stamp number STATEN 00343.

[96] Plaintiff's brief opposing summary judgment, at 29-30.

[97] Plaintiff's evidentiary submissions, Tab 9 (documentation of plaintiff's discriminatory statements), at document bearing Bates Stamp number STATEN 00104.

[98] Defendant's evidentiary submissions, Tab 3 (Johnson deposition), at 77-78.

[99] *See* Plaintiff's evidentiary submissions, Tab 9 (documentation of plaintiff's discriminatory statements), at document bearing Bates Stamp number STATEN 00071.

[100] Defendant's evidentiary submissions, Tab 1 (Staten deposition), at 233-34.

cannot reasonably be construed to be an adverse employment action, and summary judgment

is due to be granted on plaintiff's retaliation claim.[101]

## C.    Negligent Retention

Plaintiff asserts that defendant negligently retained Eric Myers when it did not

terminate his employment at some unspecified point prior to plaintiff's complaint to Rhonda

Eckstein in April of 2001.[102]

---

[101] Plaintiff's brief also suggests that her performance evaluation, dated January 16, 2001, wherein she was assigned an overall rating of "2," ("Generally acceptable performance, but improvement or additional experience is needed in one or more areas in order to meet all performance expectations of the position.") was retaliatory. Plaintiff's brief opposing summary judgment, at 28-29; defendant's evidentiary submissions, Tab 3 (Johnson deposition), at Exhibit 12 (Staten performance evaluation dated Jan. 16, 2001). Such an assertion, if it is being made by plaintiff, fails, because the performance evaluation does not rise to the level of an adverse employment action, as discussed in the immediately preceding text. Further, plaintiff did not engage in any protected activity until February of 2001 (when she made her initial complaint about Myers). *See* § I(D) *supra*.

Plaintiff's brief opposing summary judgment mentions a performance evaluation that plaintiff purportedly received in March of 2001, wherein she also received an overall rating of "2," but she does not provide a citation to the record identifying where such an evaluation might be located. *See* plaintiff's brief opposing summary judgment, at 40 (*"Myers also noted on Ms. Staten's March 2001 Performance Appraisal, which was after the complaint to Scott Johnson and after Scott Johnson had talked to Myers*, that Ms. Staten was not a team player and ranked her Level 2, needing improvement.") (emphasis supplied). As far as the court can tell from its exhaustive review of the evidence, plaintiff is actually referring to her January, 2001 performance evaluation *that was simply approved by Facility Administrator Scott Johnson on March 13, 2001. See* defendant's evidentiary submissions, Tab 3 (Johnson deposition), at Exhibit 12 (Staten performance evaluation dated Jan. 16, 2001). If such is the case, plaintiff's argument based on that evaluation is misleading and erroneous, since it represents that plaintiff received the performance evaluation in question *after* she engaged in a protected activity (her February, 2001 complaint about Myers), instead of *before*. In either event, that evaluation was not an adverse employment action that would support a retaliation claim.

[102] *See* plaintiff's brief opposing summary judgment, at 40 ("Myers should have been terminated prior to [April of 2001]."). Defendant argues that plaintiff's negligent retention claim is limited to the time period after April 2, 2001. Defendant's reply brief at 17-18. Plaintiff did state at her deposition that she believed defendant was negligent in retaining Myers *as of* April 2001, *after* she lodged her complaint with Eckstein. *See* defendant's evidentiary submissions, Tab 1 (Staten deposition), at 257-58. However, both plaintiff's amended complaint and her brief in opposition to summary judgment discuss instances prior to April 2001 when Myers allegedly should have been terminated. Accordingly, construing the evidence in the light most favorable to plaintiff, the court cannot hold that plaintiff intended to limit her negligent retention claim to the time period following April of 2001.

A negligent retention claim under Alabama law provides a remedy to an employee who is injured by another employee, when such injury proximately results from "the negligence of the employer in retaining [an incompetent or potentially dangerous employee] with knowledge of his incompetence and the danger incident to his retention." *McDuff v. Kurn,* 172 So. 886, 887 (Ala. 1937) (citations omitted). In other words, "[a]n employer 'must use due care to avoid the . . . retention of an employee whom [the employer] knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons [with whom he will have contact at his place of employment].'" *Norman v. Southern Guaranty Insurance Co.,* 191 F. Supp. 2d 1321, 1337-38 (M.D. Ala. 2002) (quoting *Brown v. Vanity Fair Mills,* 277 So. 2d 893, 894 (Ala. 1973)). To recover, "a plaintiff must show breach of the employer's above duty and that such breach proximately caused the plaintiff's injury." *Norman,* 191 F. Supp. 2d at 1338 (citing *Brown,* 277 So. 2d at 894).

Plaintiff first argues that defendant should have disciplined Myers more severely when Letitia Troupe complained about the comments Myers had made to her. As plaintiff's argument goes, if Myers had been put on probation or given more negative performance appraisals, he would not have been promoted to the position of Site Coordinator, would never have been her supervisor, and would not have been in a position to harass her. However, plaintiff does not argue that Myers should have been *terminated* for his comments to Troupe. Thus, plaintiff's argument based on these facts cannot support a negligent retention claim.

Plaintiff also argues that, based on *all* of the complaints against Myers, including both those made by Troupe and those made by plaintiff, Myers should have been terminated prior

to April of 2001.  Defendant has established a multi-step disciplinary process for its employees.  First, an employee may be required to go through a verbal counseling session with his or her supervisor; next, the employee may be issued a written warning; then, the employee may be placed on probation; finally, the employee may be dismissed from his or her employment with defendant.[103]  The policy explicitly states that "[e]ach situation is evaluated individually, and the Company will apply the steps most appropriate to a given infraction.  The Company retains discretion to determine the appropriate discipline up to and including dismissal."[104]

Defendant did not abuse its discretion in choosing not to terminate Myers prior to April of 2001.  Based on defendant's discipline policy, defendant had no duty to terminate Myers unless it felt termination was necessary to correct Myers' harassing behavior. Terminating Myers was not necessary, because probation proved to be an effective means of discipline for Myers.  After Eckstein placed Myers on probation, Myers' comments ceased.  Without question, the need for Myers' probation should have been addressed more promptly, upon receipt of plaintiff's first complaint about Myers.  Thus, plaintiff may have suffered some injury from defendant's failure to follow its policy and place Myers on probation at an earlier time.  However, plaintiff suffered no cognizable injury from defendant's failure to *terminate* Myers.

Based on the foregoing, summary judgment is due to be granted on plaintiff's

---

[103] Plaintiff's evidentiary submissions, Tab 5, at document bearing Bates Stamp Number STATEN 00100.

[104] *Id.*

negligent retention claim.

## III. CONCLUSION

In accordance with the foregoing, defendant's motion for summary judgment is due be granted in part and denied in part.  Summary judgment will be denied on plaintiff's hostile work environment claim, as well as on plaintiff's claim that she was paid less than Christy Lee.  Summary judgment will be granted on plaintiff's other disparate pay claims, as well as on plaintiff's retaliation and negligent retention claims.  Defendant's motion to file a reply brief will be granted, and plaintiff's corresponding motion to strike that reply brief will be denied.  Defendant's motion to substitute a portion of its evidentiary submissions will be granted.  Defendant's motion to strike portions of plaintiff's evidentiary submissions will be denied.  Defendant's motion to strike plaintiff's witness and exhibit list also will be denied.  An appropriate order will be entered contemporaneously herewith.

DONE this **22** nd day of December, 2003.

_____
United States District Judge